# JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| **DONALD DELANCEY,**<br><br>        **Plaintiff,**<br><br>    **v.**<br><br>**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, CLUB GROUP LONG-TERM DISABILITY PLAN, and DOES 1 through 10, inclusive,**<br><br>        **Defendants.** | ) <br> ) **Case No.: SACV 15-02022-CJC(KESx)**<br> ) <br> ) <br> ) <br> ) <br> ) **MEMORANDUM OF DECISION**<br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

# I. INTRODUCTION

Plaintiff Donald DeLancey worked as an IT Security Analyst for Automobile Club of Southern California ("Auto Club") until September 3, 2014, when he was hospitalized for a suspected transient ischemia attack. (Dkt. 50-4 [Declaration of Heidi Jacques (hereinafter "Jacques Decl.") Ex. B (Administrative Record, hereinafter "AR")] 909, 1924–30.) On January 10, 2015, DeLancey submitted a claim for long-term disability ("LTD") benefits under Auto Club's Group Long-Term Disability Plan (the "Plan") to Liberty Life Assurance Company of Boston ("Liberty"). (AR 1–12.) Liberty is responsible for administering and paying claims for LTD benefits under the Plan in accordance with the Disability Income Policy (the "Policy"). Liberty denied DeLancey's claim on April 16, 2015, (AR 784), and affirmed the denial in response to DeLancey's appeal on November 18, 2015, (AR 21).

DeLancey brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, challenging Liberty's denial of LTD benefits. After a bench trial on the administrative record, the Court finds that Liberty did not abuse its discretion in denying DeLancey's claim for LTD benefits.

# II. BACKGROUND

## A. Relevant Terms and Conditions of the Policy

The ERISA-governed LTD Plan in which DeLancey was enrolled through his employment provides that a person is "disabled" if they meet the following definition:

i.   If the Covered Person is eligible for the 6 Month Own Occupation benefit, "**Disability**" or "**Disabled**" means during the Elimination Period and the next 6 months of Disability the Covered Person is

unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

ii.    After 6 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity.

(Jacques Decl. Ex. A at 20 (emphasis in original).)  The "Elimination Period" means "a period of consecutive days of Disability for which no benefit is payable," which "begins on the first day of Disability."  (*Id.* at 21.)  This is the greater of "the end of the Covered Person's Short Term Disability Benefits" or "26 weeks."  (*Id.* at 17.)

### B.  Initial Hospitalization

On September 3, 2014, DeLancey was admitted to the emergency room at Hoag Hospital for a suspected transient ischemia attack ("TIA"), also known as a "ministroke,"[1] after he noticed "onset of fatigue and right facial droop with drooling" beginning around 9:30 a.m. while at work.  (AR 901, 905.)   He noted that he was speaking slowly and said he felt "flushed and very tired."  (AR 905.)  He also reported that he had experienced a similar episode earlier that year in January.  (*Id.*)  At the time, DeLancey was 60 years old.  The emergency room doctors conducted a CT angiography of his head and neck and concluded that it presented "no acute findings."  (*Id.*)  A neurologist also evaluated him and "felt that [DeLancey] was not a TPA[2] candidate."  (*Id.*)

---

[1] *See* Dkt. 58 at 3 n.1.

[2] TPA is short for Tissue Plasminogen Activator, a medication used to treat a stroke that must be administered within several hours of the stroke to be effective.  (*See* Dkt. 60 at 6, 6 n.2.)

DeLancey was then transferred to Kaiser Permanente Hospital ("Kaiser") because he presented with "slurred speech and aphasia.[3]"  (AR 901.)  Dr. Juy Minh Le noted that he had a "[p]ossible right lip droop" and his speech was "somewhat slow."  (AR 907.) Dr. Le observed no other neurological abnormalities.  (*Id.* ("CN II-XII otherwise grossly intact, 5/5 strength in the upper and lower extremities.  Sensation grossly intact.  Rapid finger movements intact.  Finger to nose accurate.  Babinski downgoing bilaterally.").) DeLancey was "[a]lert and oriented" and was experiencing "[n]o acute distress" but he appeared tired and his face was flushed.  (*Id.*)

The doctors at Kaiser performed an MRI and an echocardiogram, and both exams tested negative for TIA.  (AR 901; *see also* AR 920 (MRI presented "no acute abnormality," just "[m]ild periventricular white matter disease."); AR 907 (EKG presented "no acute ischemic findings.")  His CT angiogram was also normal.  (AR 907 ("No acute intracranial abnormalities/enhancement.  No significant perfusion abnormalities.  Unremarkable CT angio.").)  A speech pathologist, Kevin Schell, met with him and found his speech, cognition, and behavior to be within normal limits.  (AR 917.)  Mr. Shell noted that he "did not seem aphasic during today's session" and had "[n]o slurred speech."  (*Id.*)

Upon discharge, Dr. Nam Quoc Le reported "this patient did NOT have a Stroke during this hospital admission," (AR 904 (emphasis in original)), and that he could return to work in two days, (AR 903).   Prior to discharge, Nurse Marcus Mercado also noted that DeLancey had "no slurred speech."  (AR 921.)  DeLancey was discharged the next day and was never prescribed any stroke medication.  (AR 901, 906.)

---

[3] Aphasia is a neurological condition involving impaired ability to communicate, speak, write, and understand language.  (*See* Dkt. 56 n. 4.)

### C.  Short Term Disability Claim

DeLancey ceased working after his hospitalization on September 3 and 4, 2014, and submitted a claim to Auto Club for short term disability ("STD"), which was approved.  (Dkt. 50-1 at 3; Dkt. 56 at 2.)  Auto Club administers and sponsors its own STD plan—Liberty had no involvement in Plaintiff's STD claim and payment of benefits.  (Dkt. 56 at 2–3; Dkt. 60 at 2.)  STD coverage ceased on March 8, 2015.  (Dkt. 50-1 at 3.)

### D.  Medical Appointments Prior to Claim Submission

On September 8, 2014, four days after DeLancey was discharged from the hospital, he met with primary care physician Dr. Terry Chan and reported that he felt "sluggish," had "trouble finding words and typing," experienced "stress at work," and felt he "can't work due to dysarthria[4] and aphasia and typing difficulties."  (AR 994.)  DeLancey's neurological tests that day showed no abnormalities, (AR 997 ("He is alert and oriented to person, place, and time.  He has normal reflexes.  No cranial nerved deficit.  Gait normal.  Coordination normal.  GCS score is 15.")), but he tested positive for depression, (AR 996, 997).

DeLancey then met with a speech and language pathologist, Jaclyn Rooney, on September 12, 2014.  (AR 1044.)   He expressed concerns about "'slow speech and difficulty finding words,'" that he was "very sleepy and his eyes are 'heavy,'" and that he had "trouble speaking during a lengthy period of time."  (*Id.*)  He compared himself to the "'Old Man from the Carol Barnett Show'" and noted increased difficulty in following directions.  (AR 1044–45.)  He also reported being "very stressed" during the

---

[4] Dysarthria is a neurological condition involving difficulty controlling the muscles used in speech, often characterized by slurred or slow speech that can be difficult to understand.  (*See* Dkt. 56 n.5.)

time of his suspected TIA.  (AR 1045.)  Ms. Rooney conducted a cognitive-linguistic evaluation and found no impairment in DeLancey's orientation and awareness, immediate memory, recent memory, long-term memory, thought organization, reading and visual processing, and writing.  (AR 1045.)  Only his auditory "Processing and Comprehension" and "Logic, Reasoning, and Inference" assessments were low (60% and 37%, respectively).  (*Id.*)  His informal language screening test similarly indicated no impairment in auditory comprehension, commands, and verbal expression, except in the sub-categories of complicated "Body Part Commands" (40%) and "Responsive Naming" (60%).  (AR 1046.)  Ms. Rooney concluded that he presented with "mild aphasia and dysarthria secondary to a transient ischemic attack" because his speech was "characterized by reduced rate and loudness, and word-finding difficulties."  (AR 1049.)

On September 15, 2014, DeLancey met with a social worker, Rebecca Anne Hall, who reported that DeLancey suffered from "work stress."  (AR 1052.)  She noted that on the day DeLancey experienced the suspected TIA, he was scheduled for a performance review at work.  (*Id.*)  Several days before the scheduled performance review, a supervisor warned him that his review "may not be positive," and if it was not, he may be "let go from his job."  (*Id.*)  Ms. Hall noted that "since [the] most recent TIA [DeLancey] has experienced poor concentration, poor attention to details, slow speech and fatigue daily."  (*Id.*)  She arrived at "no diagnosis" and concluded that DeLancey had "occupational problems" and "other psychosocial and environmental problems."  (AR 1056.)

DeLancey met with Ms. Rooney for a follow up speech therapy appointment on September 25, 2014.  (AR 1110.)  Ms. Rooney again evaluated him and determined that according to "standard assessments" DeLancey "presents with attention, memory, executive functions, language, and [his] visuospatial skills are within normal limits when compared to adults his age."  (AR 1115.)  She also noted that the "[r]esults from informal

assessments should be interpreted with caution as [DeLancey] has also been diagnosed with Acute Stress disorder by Dr. Chan and signs of depression.  Motivation and performance may hinder his overall performance at this time." (*Id.*)

Four days later, on September 29, 2014, DeLancey met with Dr. Terry Thay-Lun Chan and reported symptoms of "heart flutter," speech delay, delayed walking, and lightheadedness.  (AR 1143.)  Dr. Chan found that he had no impairment in his memory, affect, and judgment.  (AR 1146.)   Dr. Chan observed signs of dysarthria, organic brain syndrome, and history of transient ischemia attack, but noted that there was "possibly some psychiatric component to this."  (*Id.*)  At a follow up appointment in January 2015, however, he abandoned his "organic brain syndrome" diagnosis.  (AR 1793.)

On October 6, 2014, DeLancey met with psychiatrist Dr. Pranav Vinaykant Shah, who conducted Global Assessment of Functioning ("GAF") testing, which demonstrated "[m]ild symptoms (e.g. depressed mood and mild insomnia) OR [s]ome difficulty in social, occupational, or school functioning; [that DeLancey h]as meaningful social relationships; [and that he is g]enerally functioning pretty well."  (AR 1177 (emphasis in original).)  Dr. Shah concluded that he had "mild depressive symptoms" for the last few months and diagnosed him with "unspecified" depression.  (AR 1176, 1177.)

DeLancey then met with Ms. Rooney for his third speech therapy session on October 8, 2014.  (AR 1218.)  At that meeting, Ms. Rooney noted that his "articulation was accurate and he was 100% intelligible during conversational speech."  (*Id.*)  She found him to present with "attention, memory, executive functions, and visuospatial skills within functional limits when compared to individuals his age," and "minimal dysarthria."  (AR 1219.)  At follow up sessions on November 18, 2014, and December 2, 2014, she reported that he no longer had dysarthria.  (AR 1437, 1567.)  At a final meeting on December 17, 2014, Ms. Rooney determined that DeLancey had satisfied his test

objectives, had "mild cognitive deficits," and required no further speech therapy but could schedule a follow up appointment in one month if he desired.  (AR 1601–02.)

On October 30, 2014, DeLancey met with a physical therapist, Mr. Bryan Rilea, due to "fatigue with walking and mobility throughout his day."  (AR 1348.)  Mr. Rilea tested him and found most of his movement to be normal or within functional limits but that his gait demonstrated a "left lateral shift of hips with left LE SLS phases of gait" and his posture demonstrated "forward head, rounded shoulders, increased thoracic kyphosis and increased cervical lordosis, increased PPT and decreased lumbar lordosis."  (AR 1349, 1351.)  Mr. Rilea gave him light therapeutic exercises including "sit to stands," a walking program, and "alternating finger tips touching" exercises.  (AR 1351.)  DeLancey also met with Mr. Rilea on November 20, 2014, when he was given a few additional exercises, (AR 1451–55), and again on December 18, 2014, when Mr. Rilea concluded that his goals were achieved and discharged him from therapy, (AR 1617–21).

On November 21, 2014, DeLancey met with Dr. Tracy Chaffee for a psychiatric evaluation.  (AR 1480.)  She diagnosed him with depressive disorder and insomnia, and she recommended supportive counseling.  (*Id.*)  On November 26, 2014, DeLancey again met with Dr. Chan who noted that his neurological assessments were normal and suspected DeLancey had "some anxiety about going back to work soon."  (AR 1520.)

On December 2, 2014, DeLancey saw an occupational therapist, Ms. Mary Recker, for "difficulty picking things up."  (AR 1541–45.)  She found most of his functions to be normal but noted "functional impairments" in his right hand and gave him corresponding exercises.  (*Id.*)  He met with Ms. Michelle Woo, another occupational therapist, on December 16, 2014, and January 5, 2015, for follow up appointments where he demonstrated "slight gains" in strength and overall "fair+ to good functional use" of his

right upper extremity.  (AR 1582, 1727.)  DeLancey also told Ms. Woo that he had been working on the computer, but that fatigue limited his time on the computer.  (AR 1727.)

DeLancey saw a neurologist, Dr. Erika Pietzsch, on December 23, 2014, and reported concern about memory loss and "[r]esidual speech and hand deficits."  (AR 1643.)  Dr. Pietzch noted that she "[s]uspect[ed] some psychosomatic component" to his symptoms.  (*Id.*)  She reviewed DeLancey's medical records and reported that he was initially "diagnosed with possible ischemic, however his MRI was negative for stroke."  (AR 1643–45.)  She reported that his Carotid Ultrasound showed "no evidence of hemodynamically significant stenosis."  (AR 1645.)  She conducted neurological exams and memory tests that showed normal results and determined that DeLancey had "nonspecific subjective cognitive problems" and a "moderate amount of chronic small vessel disease," but that there was "no specific neurological condition to be diagnosed."  (AR 1644.)  In her assessment she called the September 2014 incident as a "questionable ischemic event."  (*Id.*)  However, DeLancey requested a neuropsychological evaluation, so she approved one.  (*Id.*)

On January 29, 2015, DeLancey met with Dr. Priscilla Armstrong for a neuropsychological assessment.  He reported that he was performing all activities of daily living ("ADLs") and was able to drive, but experienced "ongoing mental confusion and fatigue for which he requires a nap daily."  (AR 1769.)  She tested his intelligence, attention and concentration, visuospatial skills, verbal memory, nonverbal/visual memory, language, executive functioning, and motor skills, which encompassed approximately 24 sub-categories.  (AR 1768–69.)  He tested in the average or high average range for his age in all categories, except for the following five sub-categories: visual skills (13th percentile), basic attention (16th percentile), visual processing speed (<1st percentile), attention and sequencing (14th percentile), and dexterity and speed in his right hand (18th percentile).  (*Id.*)  She noted that with regard to his impairments in

visual processing speed, "it should be noted that he had difficulty with visual scanning and finding items, thus his score was negatively impacted by visual skills rather than a true processing speed issue."  (AR 1768.)  She noted that this impairment also affected his attention and sequencing score.  (AR 1769.)  She concluded that his current "neuropsychological assessment revealed average range intellectual functioning," that he presented with a "generally intact neurocognitive profile," that his "cognitive skills are generally within normal limits," and that he did not meet the criteria for dementia.  (*Id.*)  She also noted that his "low average scores with motor speed and visual scanning are likely a result of possible CVA.[5]"  (*Id.*)

### E.  Long Term Disability Claim

On January 10, 2015, DeLancey submitted a claim for LTD benefits to Liberty.  (AR 1–12.)  Liberty sent his file to a licensed and Board Certified psychologist, Dr. Timothy Belliveau, for review.  (AR 862, 878.)  Dr. Belliveau reviewed DeLancey's entire medical record and concluded that it "provides insufficient support for the presence of dementia due to stroke . . . or the presence of mild cognitive impairment due to stroke," but that it does "provide reasonable support for the presence of mild depressive symptoms."  (AR 870.)  He reviewed and summarized the file in detail, (AR 870–78), and found "insufficient support for the presence of impairment in [DeLancey's] emotional, psychological, or cognitive functioning that would preclude his ability to resume his occupational functioning at any time beyond the 01/29/15 neuropsychological examination."  (AR 870.)

Liberty also sent Plaintiff's file to Dr. David Houghton, a Board Certified physician in internal medicine, for an assessment.  (AR 863.)  Dr. Houghton reviewed the

---

[5] CVA is short for "cerebrovascular accident," or a stroke.  (*See* Dkt. 56 at 1 n.1.)

entire file and concluded that the medical evidence only supported conditions of hypertension, depressive disorder, and urolithiasis.  (AR 863–64.)  He reported that "diagnostic tests and physical exams have not demonstrated any abnormalities that might provide a basis for [DeLancey's] symptoms" and that "[n]o restrictions or limitations are supported outside of psychiatric issues."  (*Id.*)

On March 31, 2015, Ms. Jeannie Swanson, a case manager at Liberty, recommended denying the claim.  (AR 8.)  Her manager, Juanita Chandra, recommended contacting DeLancey's treating physicians before making a final decision, (*id.*), so Ms. Swanson sent Dr. Belliveau and Dr. Houghton's reports to Dr. Armstrong and to Kaiser and asked for a review the assessments, including any disagreements they might have. (AR 823.)  Kaiser, responding on behalf of itself and Dr. Armstrong, indicated that "providers will not review any independent medical reviews produced for the purpose of disability benefits determination."  (AR 789.)

Rebecca Moody, another case manager for Liberty, also reviewed DeLancey's file and recommended denying the claim, and Robert Digiandomencio, her manager, agreed. (AR 7.)  On April 16, 2015, Ms. Moody sent a letter to DeLancey, notifying him that his claim had been denied.  (AR 784.)  The denial letter quoted Dr. Belliveau and Dr. Houghton's findings, as well as Kaiser's decision not to review those reports, and then explained that "[b]ased on the medical documentation received in relation to the requirements of your occupation, you do not meet the definition of disability outlined [in the Policy]."  (AR 786.)  The letter also notified DeLancey of the appeal process, which required him to submit any additional medical records in support of his appeal.  (*Id.*)

//
//
//

### F.  Appeal of Claim Denial

On August 18, 2015, DeLancey's attorney sent Liberty a letter to appeal the denial of LTD benefits[6] but failed to include any supporting documentation.  (AR 724.)  His attorney sent a follow up letter on September 21, 2015, stating that he would submit additional documentation in support of the appeal, (AR 677), which Liberty received on September 23 and 29, 2015, (AR 84–673).

On March 25, 2015, DeLancey met with Dr. Chan and reported speech problems. (AR 525.)  Dr. Chan noted that his physical and neurological exams were normal, but that his speech skills were "poor" had and "plateaued" and he was "unable to perform requested duties per his job."  (AR 528.)  On March 27, 2016, Dr. Chan reported, "In my opinion, the patient currently cannot perform the duties of his prior position at the Auto Club (IT specialist).  It requires too much high level thinking, cognitive reasoning, and interpersonal communication.  He would do very poorly and will likely make many mistakes at work.  If there is a position for him at the Auto Club that does not require the above listed duties, he may be able to work in that position . . . . Therefore he can go back to work with accommodations since we do not expect [him] ever to recover those functions and abilities."  (AR 593.)

DeLancey resumed physical therapy with Mr. Rilea on April 17, 2015, upon referral by Dr. Chan due to his reported "unsteady gait."  (AR 581.)  Mr. Rilea's examination revealed substantially the same results as his prior visits and he gave him a similar light treatment plan of therapeutic exercises.  (AR 582–84.)  DeLancey met with Mr. Rilea on May 15, 2015 (AR 581), but did not attend his follow up appointment on

---

[6] The letter also purported to appeal Liberty's denial of STD benefits, (AR 724), but DeLancey never submitted a claim for STD benefits to Liberty—his STD benefits were granted and administered independently by Auto Club, (AR 22).

June 30, 2015, because his wife had broken her arm and he was taking care of her, so he was discharged, (AR 585.)

On July 29, 2015, DeLancey saw Dr. Chan again.  (AR 617.)  He reported that his motor skills were improving but his speech issues were the same.  (*Id.*)  Dr. Chan noted that he "[a]dvised that eventually [DeLancey] will need to return to work with modified restrictions.  But given [his] anger issues [it] may not be prudent to have [him] near the public."  (AR 618.)  Dr. Chan repeated this opinion at another appointment on August 26, 2015, noting that possible work restrictions could include "limited person to person contact, no or limited computer usage, avoidance of higher level functions at work, [and] limited time at work with breaks to avoid frustration."  (AR 634.)

In March, May, and July 2015, DeLancey also met with Dr. Chaffee for counseling.   (AR 512, 575, 625.)  He reported frustration with memory and in July he reported "bouts of yelling, hitting [him]self on the head, and clearing the counter of glass condiment bottles," (AR 625), which became "less frequent" in September, (AR 176). He also saw Ms. Rooney again for speech therapy and reported speech problems.  (AR 171.)  On September 12, 2015, she conducted an updated assessment, finding that he performed at 100% in most categories, 75% in "Recent Memory" and 80% in "Mental manipulation 5 words."  (*Id.*)  She concluded that he "presents with mild cognitive deficits as a result of a stroke.  Areas of difficulty are reported in daily memory and function."  (*Id.*)

On April 24, 2015, DeLancey returned for additional occupational therapy with Ms. Woo due to his inability to remember day to day information and resulting frustration.  (AR 553.)  She encouraged writing daily as an exercise and recommended a "community resource on Cognitive day program at High Hopes Costa Mesa."  (*Id.*)  She also noted "good to normal strength" in his right upper extremity.  (*Id.*)

On May 27, 2015, he returned to neurologist Dr. Pietzsch.  (AR 599.)  She reviewed his tests, which were "within normal limits test results" with "some deficits."  (*Id.*)  "His MRI brain showed moderate amount of small vessel disease.  It is possible that those spots interrupt his cognitive function, but it is impossible to test  . . . . At this point patient has non-specific cognitive deficits, which do not meet criteria for dementia."  (*Id.*)  She prescribed Aricept, a medication used to treat Alzheimer's disease, for a brief period at DeLancey's request.  (AR 23, 31, 54, 600–04; Dkt. 56 at 18.)

On October 9, 2015, Liberty received a copy of a form that DeLancey's attorneys had prepared and sent to Dr. Chan.  (AR 75–78.)  The form contained the *attorney's* summary of DeLancey's medical history and presented questions to Dr. Chan.  (*Id.*)  For example, it listed DeLancey's symptoms such as facial droop, drooling, and dysarthria, and asked Dr. Chan to check a box indicating whether such symptoms were "neurological" or "psychological."  (*Id.*)  Dr. Chan indicated through check marks that all the symptoms were "neurological."  (AR 77.)  It also asked, "In your professional opinion, taking into account his medical findings, job description, and definition of LTD, is Mr. DeLancey disabled?" under which Dr. Chan checked a box for "yes."  (AR 78.)  In a follow up question ("If your answer is YES, then is Mr. DeLancey's disability neurological or psychological?") Dr. Chan checked the box for "neurological."  (*Id.*)  DeLancey's attorneys also provided Liberty with a letter from Dr. Chan excusing DeLancey from jury duty.  (AR 79.)

### G.  Liberty Investigation of Appeal

Liberty forwarded Plaintiff's file, including the new documents submitted on appeal, to two additional, independent physicians—Dr. Rajat Gupta, Board Certified in Neurology, Pain Medicine, and Headache Medicine, and Dr. David Yuppa, Board Certified in psychiatry and psychosomatic medicine.  (AR 28–33, 47–52.)

On October 22, 2015, at Liberty's request, Dr. Gupta conferred with DeLancey's treating neurologist, Dr. Pietzch, who stated that his neurological exams and MRI were negative for stroke and that neuropsychological testing in January 2015 showed that he had "average intelligence and generally intact cognitive functioning." (AR 54.) Dr. Pietzch repeated that she is of the opinion that DeLancey has "no significant demonstrable deficits to either physical and/or cognitive functioning." (*Id.*)

On October 28, 2015, Dr. Gupta reported that the record "supports the following diagnoses: hypertension, hyperlipidemia, chronic small vessel ischemic disease, and depression. A diagnosis of TIA is also suspected, but not confirmed . . . . The preponderance of the evidence in the available medical record, spanning from the time of hospital discharge on 9/04/14 to the present, supports that the claimant had an absence of any significant residuals from the suspected TIA—in both physical capabilities as well as cognitive and/or language functions. Therefore, there is no impairment supported for any of the time periods in question." (AR 51.) Dr. Gupta also disagreed with Dr. Chan's findings as follows:

> The claimant's PCP, Dr. Chan, has supported his patient's allegations of being impaired, but this support is based primarily on the claimant's self-reported symptoms. He does not provide objective support for his opinions. In fact, the overwhelming amount of objective evidence in the record supports that there is no significant presence of neurocognitive dysfunction. Dr. Chan's latest progress notes on 7/29/15 and 8/26/15 actually seem to implicate psychiatric issues as the major hurdle in his patient returning to work—such as his easy frustration and angry outbursts.
>
> Whether there is significant impairment from a psychiatric perspective would be best determined by a reviewer within the mental health specialty.

(AR 52.)

On November 16, 2015, Dr. Yuppa reported that "the medical evidence does not support the claimant's complaints of cognitive impairment.  Neuropsychological testing was generally within normal limits, and neither Dr. Chaffee nor Dr. Shah documented any clinical evidence of the claimant's reports of cognitive abnormalities."  (AR 33.)  He also stated the clinical evidence "does not corroborate the claimant's reports of symptoms or support the presence of an impairing degree of symptomatology."  (*Id.*)

**H.  Additional Medical Records from New Doctors**

In late October 2015, DeLancey's attorneys provided Liberty with additional records.  (AR 56, 59.)  DeLancey's attorney had prepared another form (nearly identical to the one sent to Dr. Chan) and sent it to Dr. Phillip O'Carroll.  Dr. O'Carroll saw DeLancey on September 22, 2015.  (AR 63.)  Dr. O'Carroll checked the boxes on the form indicating that DeLancey's symptoms were neurological rather than psychological and that he had a neurological disability.  (AR 60–62.)  On another form prepared by DeLancey's attorneys, Dr. O'Carroll indicated that DeLancey had suffered a TIA and diagnosed him with "cognitive impairment."  (AR 63.)  Dr. O'Carroll indicated that DeLancey would have difficulty with low or moderate stress work because of "cognitive impairment" due to "possible stroke/TIA."  (AR 64.)  The report included no diagnostic evidence or test results, nor did it indicate which, if any, medical records he relied on.

DeLancey's attorneys also provided Liberty with a pre-prepared "Psychological Opinion" form filled out by Dr. Joshua Matthews.  Dr. Matthews checked boxes on the form indicating that DeLancey can understand and carry out short instructions but that he cannot maintain focus and concentration, sustain an ordinary routine, complete a normal workday, deal with work stress, work independently, troubleshoot IT problems, or sit for

eight hours a day to do IT security reports.  (AR 57.)  He also checked boxes indicating that with difficulty DeLancey could get along with coworkers, handle instructions and respond appropriately to supervisors, and deal with stress of skilled work requiring critical thinking and judgment.  (*Id.*)  Like Dr. O'Carroll's form, this report included no diagnostic evidence or test results, nor did it indicate which, if any, medical records he relied on.

## I.  Liberty Upholds Denial of Benefits

On November 18, 2015, after conducting an independent review of the entire claim file and rebuttal evidence, including the reports from Dr. O'Carroll and Dr. Matthews, Heidi Jacques, an Appeal Review Consultant for Liberty, prepared and sent a letter affirming the denial of benefits.  (AR 21–26.)  The letter included a summary of all new rebuttal evidence as well as the independent reviews of Dr. Yuppa and Dr. Gupta.  (*Id.*)  In the letter Liberty acknowledged that DeLancey "may experience some symptoms associated with his condition."  (*Id.*)  However, it concluded that "the available information does not contain physical, neurologic, neuropsychologic or mental status exam findings, diagnostic test results, or other forms of medical documentation that reasonably correlate with Mr. DeLancey's subjective complaints and to support that his symptoms were of such severity that they resulted in restrictions or limitations rendering him unable to perform the duties of his occupation throughout and beyond the Policy's elimination (waiting) period."  (AR 25.)  Liberty maintained that DeLancey had not adequately demonstrated disability.  (*Id.*)

//
//
//
//

# III.  DISCUSSION

## A.  Standard of Review

The parties dispute the applicable standard of review.  (*See* Dkt. 56 at 3; Dkt. 60 at 14.)  Although de novo review is the default standard, where a plan confers "discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  To trigger the deferential standard, a plan must "unambiguously provide discretion to the administrator" but no particular "magic words" are necessary.  *Id.*  Here, the Plan states "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."  (Jacques Decl. Ex. A at 40.)  This language unambiguously provides discretion to the Plan Administrator, so Defendants correctly assert that the abuse of discretion standard applies.  *See Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1217 (9th Cir. 2008) ("The Plan here was a discretion-granting one, as it stated that Liberty 'shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility thereunder.'"); *see also Abatie*, 458 F.3d 963 (A plan stating that "[t]he *responsibility for* full and *final determinations of eligibility for benefits; interpretation of terms*; determinations of claims; and appeals of claims denied in whole or in part under the HFLAC Group [Home Life] policy rests *exclusively* with HFLAC" triggered the abuse of discretion standard. (emphasis in original)).

Under the deferential abuse of discretion standard, "a plan administrator's decision will not be disturbed if reasonable.  This reasonableness standard requires deference to the administrator's benefits decision unless it is (1) illogical, (2) implausible, or (3)

without support in inferences that may be drawn from the facts in the record." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (internal quotation marks and citations omitted). A district court may only review the administrative record when considering whether a plan administrator abused its discretion. *Abatie*, 458 F.3d at 969–70. However, evidence outside the administrative record that was before the Plan Administrator can be considered to evaluate the effect of a conflict of interest on the decision making process.[7]  *Id.*

## B.  Conflict of Interest

When an insurer acts as both the plan fiduciary and the funding source for benefits, an inherent structural conflict of interest exists. *Abatie*, 458 F.3d at 965 (citing *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999)). The presence of a conflict of interest merely contributes to the district court's decision of "how much or how little to credit the plan administrator's reason for denying insurance coverage." *Id.* at 968. If a structural conflict is unaccompanied by evidence of "malice, of self-dealing, or of a parsimonious claims-granting history," its effect on the district court's analysis may be slight. *Id.* If, however, "the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants

---

[7] Defendants move to strike numerous portions of Plaintiff's briefing on the grounds that it references and relies on material outside the Administrative Record—namely, declarations of DeLancey, Dr. Chan, and the briefs previously filed in this case. (Dkt. 64.) DeLancey objects on the grounds that such evidence may be considered to determine the standard of review, (Dkt. 65 at 2–3), but the evidence in question is irrelevant to the standard of review in this case, (*see infra*, n.8). DeLancey also argues that he has good cause to introduce such evidence because he did not have a prior opportunity to respond to the Liberty's assessment of certain rebuttal evidence and "attacks" of his credibility. (*Id.* at 4–6.) This is also unavailing, since Liberty afforded DeLancey numerous opportunities to submit rebuttal evidence, of which he took advantage. Furthermore, much of the evidence that he wanted to "respond" to was evidence that *he* submitted, such as reports from Dr. Chan. (*See id.*) That he did not like the way Liberty characterized such evidence is not grounds to introduce evidence outside the Administrative Record. Accordingly, the Court hereby GRANTS the motion to strike.

by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record," the district court may weigh the presence of a conflict more heavily. *Id.* at 968–69 (internal citations omitted).

Even if the plan presents these more serious conflicts, the standard of review remains abuse of discretion. *Id.* 968–69. "[T]he existence of a conflict [is] a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009). Additional factors to be considered in determining whether a plan administrator or fiduciary abused its discretion include "the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any." *Id.* (internal quotation marks omitted).

As Liberty concedes, it has a conflict because it both funds and decides LTD benefit claims under the Plan. (Dkt. 60 at 14.) However, the effect of Liberty's conflict on the Court's analysis is slight. *See Abatie*, 458 F.3d at 968. DeLancey has offered no real evidence "of malice, of self-dealing, or of a parsimonious claims-granting history." *Id.* at 968.

DeLancey provides a laundry-list of criticisms in an attempt to show that the conflict improperly impacted Liberty's decision.[8]  DeLancey contends that Liberty

---

[8] At the hearing, DeLancey's attorneys argued that many of his criticisms also support de novo review. While the Court finds that none of DeLancey's criticisms have merit, even if they did, the standard of review would still be abuse of discretion. *Abatie*, 458 F.3d at 968–69.

looked for and manufactured reasons to deny his claim and ignored or "cherry picked" critical evidence.[9]  (Dkt. 56 at 5–6, 13, 22; Dkt. 58 at 7–10, 13, 14, 16, 20.)  To the contrary, the record shows that Liberty *twice* conducted a thorough, independent, good-faith review of DeLancey's claim, which entailed an analysis of over 1,900 pages in medical records.  (AR 21–26, 784–87.)  It requested peer reviews from four experienced, Board Certified specialists in psychology, psychiatry, neurology, and internal medicine.  (AR 28–33, 47–52, 870–78, 863–64.)  Each of these reviewing physicians conducted a full review of the medical record and the neurologist consulted for the appeal, Dr. Gupta, conferred with DeLancey's treating neurologist, Dr. Pietzsch, prior to making his final assessment.  (AR 54.)  Liberty also attempted to obtain Kaiser doctors' review of such reports and invited their criticisms, but Kaiser declined to do so as a matter of policy.  (AR 789, 823.)  The Court finds no evidence that Liberty ever withheld information or records from any of the reviewing physicians.  Liberty even permitted DeLancey extra time to produce medical records on multiple occasions after his appeal letter failed to attach any evidence.  (AR 56, 59, 84–673, 677, 724).  DeLancey points out that Liberty did not provide him with Dr. Gupta and Dr. Yuppa's reports until after the final appeal letter was issued.  (Dkt. 56 at 8, Dkt. 58 at 11.)  This is immaterial, however, since DeLancey points to no authority requiring such disclosure *before* Liberty has finished conducting its review.

DeLancey also notes that the doctors conducting the peer reviews did not personally examine him.   (Dkt. 56 at 7; Dkt. 58 at 9.)   In this case, such in-person

---

[9] DeLancey often references two different standards of disability—whether a claimant is unable to perform his "own occupation," or whether he is unable to perform "any occupation." (*See* Dkt. 56 at 6–9, 21, 25; Dkt. 58 at 10, 12, 25.)  He claims, without support, that Liberty disregarded evidence relating to both standards.  (*See id.*)  In doing so, he misreads the definition of disability under the Plan.  The Plan provides that "Disability" or "Disabled" means "during the Elimination Period and the next 6 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness." (Jacques Decl. Ex. A at 20 (emphasis added).)  Only *after* receiving benefits for six months, which was not the case here, does the Plan consider whether the claimant can perform any occupation.  (*See id.*)

review was unnecessary.  *Cf. Montour*, 588 F.3d at 634 (finding that the insurer's failure to conduct an in-person medical evaluation raised questions as to the reliability of the insurer's decision where it was not clear that the insurer presented the reviewing physicians with all relevant evidence).  Not only did the reviewing physicians have DeLancey's complete and voluminous medical records, which they referenced in great detail in their own reports, but, as explained in greater detail below, they largely *agreed* with the analysis of the treating physicians who actually undertook neurological exams, CT scans, and MRIs of DeLancey.  (*See* AR 28–33, 47–52, 863–64, 870–78, 901–07, 920, 1643–44.)

DeLancey claims that Liberty ignored evidence that Auto Club had approved his short-term disability claim.  (Dkt. 58 at 6, 9–10.)  Such evidence, however, is irrelevant.  The Auto Club's determination is not medical evidence—it is a separate and non-binding conclusion reached by a different agency.

DeLancey contends that Liberty did not engage in the requisite "meaningful dialogue" with him by failing to explain what additional information was required to support his claim.  (Dkt. 56 at 8; Dkt. 58 at 11.)  DeLancey misunderstands this requirement.  The Ninth Circuit has held that "[i]f benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it."  *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).  Here, Liberty did not believe that more information was needed—it determined that he was *not* disabled, so its explanation of the grounds for the denial and its invitation to DeLancey to submit whatever records he thought would be helpful on appeal was sufficient.  (AR 786.)

DeLancey also argues that Liberty shifted its reasons to deny benefits and "tacked on" new bases for the denial in its denial of the appeal, including that DeLancey did not complete the Elimination Period.  (Dkt. 56 at 14; Dkt. 58 at 14, 15.)  This is false.  In the denial of his appeal, Liberty simply considered new evidence, much of which *DeLancey* had provided, in reaching the *same* conclusion that he did not meet the Plan's definition of a disabled person.  (AR 25 ("[T]he available information does not contain physical, neurologic, neuropsychologic or mental status exam findings, diagnostic test results or other forms of medical documentation that reasonably correlate with Mr. DeLancey's subjective complaints and to support that his symptoms were of such severity that they resulted in restrictions or limitations rendering him unable to perform the duties of his occupation throughout and beyond the Policy's elimination (waiting) period.  Having carefully considered all of the information submitted in support of Mr. DeLancey's claim, our position remains that proof of his disability in accordance with the policy provisions has not been provided."); AR 786 ("Based on the medical documentation received in relation to the requirements of your occupation, you do not meet the definition of disability.").)

DeLancey claims that Liberty unfairly demanded objective evidence for subjective symptoms.  (Dkt. 56 at 10; Dkt. 58 at 12.)  This similarly mischaracterizes the record.  As laid out in further detail below, Liberty did not base its denial solely on the fact that most of the evidence favorable to DeLancey was subjective self-reporting.  Rather, it observed that the majority of objective evidence *conflicted* with DeLancey's claim of being disabled.[10]

---

[10] For the same reason, DeLancey's argument that Liberty ignored the "Non-Verifiable" Symptoms clause in the Plan because it insisted on objective evidence and ignored self-reported symptoms is unavailing.  (Dkt. 56 at 9–10; Dkt. 58 at 12.)

DeLancey also argues that Liberty mischaracterized his job as sedentary while his job also involved cognitive skills.  (Dkt. 56 at 12; Dkt. 58 at 13.)  A sedentary job and a job involving cognitive skills are not mutually exclusive, so this characterization is not incorrect.  Here, Auto Club provided Liberty with a report describing DeLancey's job as "primarily an office job" that required him to sit at a desk and use a computer approximately 98% of the time to protect Auto Club's computer systems from intentional or inadvertent access or destruction.  (AR 1924–26.)  In any event, this distinction is of little consequence because Liberty's denial relies primarily on evidence in the medical record showing that DeLancey did not suffer from a degree of *cognitive* impairment that would render him unable to perform at his job.  Finally, DeLancey also argues that Liberty mischaracterized his condition as psychological or psychiatric.  (Dkt. 56 at 11; Dkt. 58 at 13.)  In actuality, as described further below, this characterization was made by some of the treating *and* reviewing medical professionals.  (AR 52, 1146, 1480, 1176, 1177.)  And even if this description was incorrect, the record nevertheless supports Liberty's conclusion that DeLancey was not disabled, as outlined further below.

Simply put, there is no evidence that Liberty's conflict of interest impacted its decision, so the impact of the conflict on the Court's analysis remains slight.

## C.  Reasonableness of Liberty's Denial

Liberty's decision denying DeLancey LTD benefits was sufficiently supported by the substantial evidence before it.  Liberty reasonably concluded that the extensive medical records rule out a TIA or other neurological (or psychological) event that rendered him "unable to perform *all* of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness," as required by the Plan.  (Jacques Decl. Ex. A at 20 (emphasis added).)

The doctors who first evaluated DeLancey on the day of the suspected TIA decided that he was not a "candidate" for medication used to treat a TIA or stroke.  (AR 905.)  His CT angiogram, MRI, and echocardiogram from that day were also all negative for stroke, (AR 901, 905), and his neurological exams similarly showed no abnormalities, (AR 907).  He was discharged from the hospital after the treating physician, Dr. Le, affirmatively concluded that he had not had a stroke and did not give him any stroke medication.  (AR 904.)  DeLancey's sweeping assertion that all treating and examining doctors diagnosed him with CVA/TIA is false.  (*See* Dkt. 56 at 2.)  That his doctors met with him before and after the hospitalization because of suspected CVA/TIA or other ischemic event does not mean that they went on to diagnose him with one—in fact, his treating physicians ruled out such a diagnosis, and Dr. Gupta, a neurologist, concurred in this assessment in his peer review.  (AR 47–52.)  Although DeLancey's MRI did present "[m]ild periventricular white matter disease," (AR 920), this does not prove neurological impairment.  DeLancey's earlier MRI from January 2014 also showed mild periventricular white matter disease, (AR 871), but his self-reported symptoms did not begin until the suspected TIA incident in September of that year.  DeLancey's own treating neurologist, Dr. Pietzsch, reviewed the MRI results after his hospitalization and confirmed that DeLancey had "no specific neurological condition to be diagnosed."  (AR 599, 1644.)  And as Dr. Gupta explained, "even if a vascular etiology is presumed, there is no indication that this led to any permanent infarction in the brain."  (AR 50.)

The record also supports Liberty's finding that even after the suspected TIA, DeLancey did not suffer cognitive impairment that would render him unable to perform the functions of his job.  The speech pathologist who saw him when he was initially hospitalized found his speech, cognition, and behavior to be within normal limits.  (AR 917.)  DeLancey continued to report symptoms including trouble finding words, dysarthria, and aphasia in his follow up appointments after he was discharged from the hospital, but his neurological exams were consistently normal.  (*See, e.g.*, AR 528, 997,

1520, 1644.)   While Ms. Rooney's observations during speech therapy could support Plaintiff's subjective reports of his symptoms, they are insufficient to counter the extensive neurological evidence in the record and her own assessments that he was generally functioning well compared to others his age—and in any event, her observations do not support a finding of disability because she concluded that his reported symptoms had *resolved* by December 2014.  (AR 1437, 1567, 1601, 1602.)  His physical and occupational therapists similarly observed that he was generally functioning well for his age group and eventually discharged him.  (AR 1541–45, 1582, 1727, 1348–51, 1617–21.)  DeLancey points to the number of medical professionals who took note of DeLancey's subjective reports of his own symptoms, (*see* Dkt. 56 at 16–21), but, as the record demonstrates, his reports conflicted with these same professionals' *own* assessments.  (*See* AR 28–33, 47–52, 863–64, 870–78, 901–07, 920, 1643–44.)  Nor did Liberty ignore evidence of DeLancey's own comments to his doctors and therapists in reaching its decision.  (*See* AR 25 ("[W]e do acknowledge that Mr. DeLancey may experience some symptoms associated with his condition.").

Four separate doctors also conducted a peer review of DeLancey's medical records at Liberty's request and confirmed that there was insufficient evidence to support a finding that DeLancey suffered cognitive impairments that would render him unable to perform his work duties.[11]  (AR 28–33, 47–52, 870–78, 863–64.)  Most significantly, Dr. Gupta, the neurologist, conferred with DeLancey's treating neurologist *and* independently reviewed the medical record before coming to his own conclusion.  (AR 51, 54.)  These numerous assessments provide more than a reasonable basis for Liberty's determination.

---

[11] DeLancey briefly questions whether Dr. Houghton and Dr. Belliveau had appropriate expertise and training because Dr. Houghton practices internal medicine and pediatrics and Dr. Belliveau is a non-physician.  (Dkt. 58 at 10.)  The Court has reviewed their credentials, (*see* Dkt. 60-4; Dkt. 60-5), and finds them well qualified for the purposes of their assessments in this case.

DeLancey relies heavily on the opinion of Dr. Chan, (*see* Dkt. 56 at 16–17; Dkt. 58 at 16, 20), who believed that DeLancey could not perform his job duties, (AR 528, 593, 634).  However, Dr. Chan's reports are far less credible because he never based his conclusions on conclusive testing or neurological evidence—he relied on the subjective reports of DeLancey that actually conflict with the substantial weight of the medical records and with most of the other doctors' findings.  As Dr. Gupta noted, "the overwhelming amount of objective evidence in the record supports that there is no significant presence of neurocognitive dysfunction.  Dr. Chan's latest progress notes on 7/29/15 and 8/26/15 actually seem to implicate psychiatric issues as the major hurdle in his patient returning to work—such as his easy frustration and angry outbursts."  (AR 52.)  Dr. Shah confirmed that DeLancey had depressive symptoms, (AR 1176, 1177), and Dr. Chaffee also diagnosed him with depressive disorder, (AR 1480).  Dr. Chan's conclusions are undermined by his own diagnosis that DeLancey had acute stress disorder, (AR 1115), his observation that there was "possibly some psychiatric component to [his symptoms]," (AR 1146), and the fact that he later abandoned his diagnosis of "organic brain syndrome," (AR 1793).  Dr. Chan's later assessments are even less credible because he simply checked boxes on forms that DeLancey's own attorney had prepared and asked him to fill out.  (AR 75–78.)  Thus, it was reasonable for Liberty to give more weight to the assessments of Dr. Pietzsch, Dr. Gupta, and Dr. Le, and the evidence from speech therapy, occupational therapy, and physical therapy showing that his symptoms had largely resolved and he was within functional limits for his age.

DeLancey also places considerable weight on the "raw scores" Dr. Armstrong observed.  (Dkt. 56 at 13, 20; Dkt. 58 at 3, 11, 17, 18, 19.)  However, only five of the approximately twenty-four categories Dr. Armstrong tested revealed low scores, and she noted that two of them were likely the result of his visual impairment, (AR 1768–69), which is consistent with reports that DeLancey wears corrective lenses, (AR 871, 1023,

1031).  Dr. Armstrong failed to acknowledge that DeLancey wears corrective lenses or a hearing aid, which could have further impacted her results.  (AR 871.)  In any event, Dr. Armstrong concluded that DeLancey's "neuropsychological assessment revealed average range intellectual functioning" and that he presented with a "generally intact neurocognitive profile."  (AR 1769.)  Dr. Houghton reviewed Dr. Armstrong's assessments and reported that "[e]ven with the assumption that the obtained exam results are valid indices of the claimant's neuropsychological status, the obtained test data provide insufficient support for the presence of cognitive impairment due to a neurological disorder.  The test results show intact general intellectual functioning, high average verbal and language-based reasoning abilities, average processing speed, average visual-spatial and constructional abilities, average verbal memory, and average to high average visual memory."  (AR 872.)

Finally, the reports from Dr. Phillip O'Carroll and Dr. Matthews are not persuasive.  Both doctors saw DeLancey for the *first* time over a year after the suspected TIA incident and they were specifically retained by DeLancey's attorney—they were not DeLancey's treating physicians.  (AR 57, 60–64.)  They only met with DeLancey once and were asked to answer a specific set of pointed questions.  (*See id.*)  Unlike the four peer reviewers Liberty consulted, it is also unclear whether Dr. O'Carroll or Dr. Matthews had access to his full medical record and if so whether they reviewed the record or simply relied on DeLancey's attorneys' medical summary.[12]

Considering all of this evidence together, the Court finds that Liberty did not abuse its discretion in deciding to deny DeLancey LTD benefits.  Liberty properly considered

---

[12] DeLancey's meeting with the social worker demonstrated that he experienced the suspected TIA the same day he was scheduled for a work performance evaluation.  (AR 1052.)  He had been previously warned that the evaluation might not be positive, and if so, he could be fired.  (*Id.*)  This evidence does not constitute an attack DeLancey's character or credibility, (*see* Dkt. 58 at 22), but rather provides a credible alternative explanation for DeLancey's symptoms and is corroborated by the numerous reports of work stress in the medical records.  (*See, e.g.*, AR 1115, 1045, 1052, 1520.)

all the evidence before it, including DeLancey's subjective evidence.  However, because his subjective evidence conflicts with the majority of objective evidence of his medical history and cognitive capabilities, the Court cannot say that Liberty's decision was illogical, implausible, or unsupported by the nearly 2,000 page medical record.

## IV.  CONCLUSION

Liberty's decision to deny DeLancey long-term disability benefits was not an abuse of discretion.  Accordingly, the Court affirms Liberty's denial of benefits.

DATED:     January 13, 2017

_____

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE